# *Exhibit A*

 POLICE DEPARTMENT

**The City of New York**

--------------------------------------------------------------x

In the Matter of the Disciplinary Proceedings    :

               against    :    FINAL

Detective Joseph Franco    :    ORDER

Tax Registry No. 925313    :    OF

Military and Extended Leave Desk    :    DISMISSAL

--------------------------------------------------------------x

Detective Joseph Franco, Tax Registry No. 925313 ███████████ ███ having been served with written notice, has been tried on written Charges and Specifications numbered 2019 20565 as set forth on form P.D. 468-121, dated June 5, 2019, and amended November 20, 2019, and after a review of the entire record, is found Guilty.

Now therefore, pursuant to the powers vested in me by Section 14-115 of the Administrative Code of the City of New York, I hereby DISMISS Detective Joseph Franco from the Police Service of the City of New York.

**DERMOT F. SHEA**
**POLICE COMMISSIONER**

EFFECTIVE:

COURTESY • PROFESSIONALISM • RESPECT
**Website: http://nyc.gov/nypd**



POLICE DEPARTMENT

March 23, 2020

---------------------------------------------------------------x

In the Matter of the Charges and Specifications          :          Case No.

- against -          :          2019-20565

Detective Joseph Franco          :

Tax Registry No. 925313          :

Military and Extended Leave Desk          :

---------------------------------------------------------------x

|  |  |
|---|---|
| At: | Police Headquarters<br>One Police Plaza<br>New York, NY 10038 |
| Before: | Honorable Jeff S. Adler<br>Assistant Deputy Commissioner Trials |

APPEARANCES:

| For the Department: | Penny Bluford-Garrett, Esq.<br>Department Advocate's Office<br>One Police Plaza<br>New York, NY 10038 |
|---|---|
| For the Respondent: | Howard Tanner, Esq.<br>Tanner & Ortega, LLP<br>299 Broadway, Suite 1700<br>New York, NY 10007 |

To:

HONORABLE DERMOT F. SHEA
POLICE COMMISSIONER
ONE POLICE PLAZA
NEW YORK, NY 10038

COURTESY  •  PROFESSIONALISM  •  RESPECT
Website: http://nyc.gov/nypd

DETECTIVE JOSEPH FRANCO                                                                          2

## CHARGES AND SPECIFICATIONS

1. Said Detective Joseph Franco, while assigned to Narcotics Borough Manhattan South, on or about April 10, 2018, while on duty, caused false entries to be made in Department records, to wit: said Detective indicated in a New York City Police Department Observation DD5 Report that he observed two (2) individuals identities known to the Department engage in a narcotics related transaction when that was not in fact true.

   P.G. 203-08, Page 1, Paragraph 1          FALSE STATEMENTS

2. Said Detective Joseph Franco, while assigned to Narcotics Borough Manhattan South, on or about April 10, 2018, while on duty, caused false entries to be made in Department records, to wit: said Detective provided a member of service known to the Department with false information which led to the creation of two (2) New York City Police Department Arrest Online Omniform Reports for the arrests of two individuals known to the Department to be filed with the Department containing false information.

   P.G. 203-08, Page 1, Paragraph 1          FALSE STATEMENTS

3. Said Detective Joseph Franco, while assigned to Narcotics Borough Manhattan South, on or about April 11, 2018, while on duty, caused false entries to be made in the Criminal Court of New York County, to wit: said Detective provided a member of service known to the Department with false information which led to two (2) Criminal Court Affidavits containing false information to be filed with the Court of New York County.

   P.G. 203-08, Page 1, Paragraph 1          FALSE STATEMENTS

4. Said Detective Joseph Franco, while assigned to Narcotics Borough Manhattan South, on or about April 16, 2018 and May 30, 2018, falsely testified before the Grand Jury in New York County that he observed two (2) individuals identities known to the Department engage in a narcotics related transaction, when that was not in fact true.

   P.G. 203-08, Page 1, Paragraph 1          FALSE STATEMENTS

5. Said Detective Joseph Franco, while assigned to Narcotics Borough Manhattan South, on or about May 17, 2018, while on duty, caused false entries to be made in Department records, to wit: said Detective indicated in a New York City Police Department Observation DD5 Report that at approximately 1540 hours, he observed three (3) individuals, identities known to the Department engage in a narcotics related transaction, when that was not in fact true.

   P.G. 203-08, Page 1, Paragraph 1          FALSE STATEMENTS

6. Said Detective Joseph Franco, while assigned to Narcotics Borough Manhattan South, on or about May 17, 2018, while on duty, caused false entries to be made in Department records, to wit: said Detective indicated in a New York City Police Department Observation DD5 Report that at approximately 1605 hours, he observed three (3) individuals identities known to the Department engage in a narcotics related transaction, when that was not in fact true.

   P.G. 203-08, Page 1, Paragraph 1          FALSE STATEMENTS

3

7.  Said Detective Joseph Franco, while assigned to Narcotics Borough Manhattan South, on or about May 17, 2018, while on duty, caused false entries to be made in Department records, to wit: said Detective provided a member of service known to the Department with false information which led to the creation of four (4) New York City Police Department Arrest Online Omniform Reports for the arrests of four (4) individuals identities known to the Department to be filed with the Department containing false information.

    P.G. 203-08, Page 1, Paragraph 1             FALSE STATEMENTS

8.  Said Detective Joseph Franco, while assigned to Narcotics Borough Manhattan South, on or about May 17, 2018, while on duty, caused false entries to be made in the Criminal Court of the County of New York, to wit: said Detective provided a member of service known to the Department with false information which led to three (3) Criminal Court Affidavits containing false information to be filed with the Court of New York County. (*As amended*)

    P.G. 203-08, Page 1, Paragraph 1             FALSE STATEMENTS

## REPORT AND RECOMMENDATION

The above-named member of the Department appeared before me on December 2 and 3, 2019, and February 3, 2020.  Respondent, through his counsel, entered a plea of Not Guilty to the subject charges.  The Department called Detective Kyle Crevatas and Sergeant Alvin Valdez as witnesses, and introduced video footage of the two incidents.  Respondent called Lieutenant Washington Zurita and Detectives Logan Payano, Jawuan Hubbard, and Edwin Martinez as witnesses.  Respondent testified on his own behalf.  A stenographic transcript of the trial record has been prepared and is available for the Police Commissioner's review.  Having reviewed all of the evidence in this matter, I find Respondent guilty of all charges and recommend that he be dismissed from the Department.

## ANALYSIS

This case involves multiple allegations of false statements made by Respondent in connection with three narcotics-related transactions that he claims to have witnessed on two separate dates in New York County.  The information provided by Respondent led to the arrest

DETECTIVE JOSEPH FRANCO                                                    4

of several individuals. It is alleged that Respondent did not, in fact, witness the drug

transactions. Specifically, Respondent claimed that on April 10, 2018, he observed Person A

purchase narcotics from Person B inside ███████████, leading to the arrests of Person A and

Person B. Respondent also claimed that on May 17, 2018, he witnessed two separate drug

transactions inside ██████████████, where Person C and Person D sold

narcotics to Person E, and, 25 minutes later, the same two individuals sold narcotics to

Person F; all four individuals were arrested. The Department offered evidence, including video

footage, to establish that Respondent did not make any of these observations.

A.    ██████████████

        Detective Kyle Crevatas, who was assigned as a police officer to Manhattan South

Narcotics at the time of the incidents, testified that Respondent was a member of his field team on

April 10, 2018. Respondent made a radio transmission where he informed the team of a

positive drug transaction, and provided descriptions of the individuals involved in the sale.

Person A and Person B were arrested by Crevatas based on the information provided by

Respondent.

Crevatas prepared arrest reports (Dept. Ex. 2, 3) and drafted criminal court affidavits (Dept. Ex. 4,

5), in reliance on Respondent's information, including Respondent's Observation – Ghost

Report (Dept. Ex. 1). The arrest reports indicate that Respondent observed the drug sale take

place in the "lobby of the building." According to Crevatas, he worked with Respondent on

about 50 operations spanning one year, and never had reason to believe that Respondent did not

witness what he claimed to have witnessed. Crevatas described Respondent as "very good at

what he did" because he blended in, and was able to detect narcotics transactions. (Tr. 9-11, 15-

17, 22, 46-47, 49, 63-64, 66)

DETECTIVE JOSEPH FRANCO

Sergeant Alvin Valdez, who worked for IAB Group 54 at the time, testified that on April 30, 2018, he was assigned to investigate this matter. As part of his investigation, Valdez reviewed Respondent's two Grand Jury testimonies regarding the alleged drug sale (Dept. Ex. 14, 15) and the video surveillance footage of 45 Rutgers Street (Dept. Ex. 16A). (Tr. 77-78, 81-82, 84, 87-89, 96-99)

In his Grand Jury testimony on April 16, 2018, regarding the April 10 alleged drug transaction between Person A and Person B, Respondent testified to the following:

> I saw Person A and Person B in conversation. I told the team I saw money in her hand, she was walking, so I told the team to stand by, like there may be a transaction going on and I followed them. Person B asked how many - - he asked how many, she replied two. Once I heard that conversation, I followed them. They went to ▮▮ where she handed him the money. He left her, he separated from her for a moment, then came back to her, he handed her a couple of items by touching hands, they separated; she walked west on ▮▮ and he came to the corner of ▮▮ and ▮▮ after the transaction.

(Dept. Ex. 14 at 5-6) Respondent further testified that he told his team that he observed the positive drug transaction. Detective Payano subsequently followed and arrested Person A on ▮▮, while Respondent and two other detectives arrested Person B at the corner of ▮▮ and ▮▮. Respondent walked to ▮▮ where he observed Payano recover two Ziploc bags of crack cocaine from Person A. (Dept. Ex. 14 at 6)

In his second Grand Jury testimony on May 30, 2018, Respondent again testified that he "followed [Person A and Person B] to ▮▮ where she handed in the money. Short time later after she handed in the money, he walked off, came back and he handed several items by touching hands." (Dept. Ex. 15 at 5-6) Upon additional questioning by the Assistant District Attorney (ADA), Respondent, under oath, gave the following answer:

ADA:    Detective, a grand juror would like to know, do you know if anyone followed Person B when he walked off before coming back to

DETECTIVE JOSEPH FRANCO

Defendant Person A?

Respondent:    No, he walked like within the building, like within the lobby area, not too long, it's two elevators, two staircases on the side, and he walked around that area and came back, he went around the corner, I did not get to see him, but he came back, that's when the transaction happened.

(Dept. Ex. 15 at 6-7)

Video surveillance footage in connection with the April 10 incident at ███████████ was introduced as Dept. Ex. 16A. In that footage, at 00:01, Person B and Person A appear together walking up the outdoor steps of ████████, and entering the front door of the building. At 00:10, an unidentified individual, whose facial features were unclear due to the quality of the video footage, enters the building behind them. At 00:17, Person B and Person A walk into the lobby area of the building followed by the unidentified individual. At 00:23, Person B is captured in the bottom right corner of the footage turning towards the hallway to the right of the elevator with Person A following closely behind him. The unidentified individual, meanwhile, walks straight into the elevator, prevents the elevator door from closing with his hand, and then moves further back into the elevator when another individual pushing a stroller and two children enter. At 00:54, Person A appears in the bottom right corner of the footage leaving the right-side hallway area and re-entering the lobby toward the exit. Ten seconds later, Person B also leaves the right-side hallway and re-enters the lobby area. Person A exits the building at 01:10, shortly followed by Person B who leaves at 01:23. (Dept. Ex. 16A)

Several photographs of ████████ were received in evidence as Dept. Ex. 18A-F. The images include multiple views of the building's interior lobby area, the right-side hallway that branches off from the lobby, the right-side stairwell door, and the elevator.

Respondent, who was assigned to Manhattan South Narcotics at the time of the incident, testified that at approximately 1510 hours on April 10, 2018, he was conducting a narcotics

DETECTIVE JOSEPH FRANCO

operation in the vicinity of ███████ and ████████ after receiving community complaints of ongoing drug transactions taking place there. While riding his bicycle, Respondent overheard a narcotics-related conversation between a male (later determined to be Person B) and a female (later determined to be Person A near the corner of ████████ and ████████. Based on his experience and familiarity with ██████████ as a drug-prone building, Respondent surmised that Person A and Person B were traveling to ██████ to engage in a drug sale. Respondent testified that he did not follow Person A and Person B to █ ████████, but, instead, rode ahead of them to the rear of the building in order to avoid detection. He claimed that he was able to use his bicycle to arrive at the rear entrance in approximately 10 seconds, while Person A and Person B walked slowly towards the front entrance of ███████ on foot. Respondent admittedly did not observe Person A or Person B actually enter ████████.[1] (Tr. 329-338, 376, 468-470, 491)

Respondent testified that, from his experience, drug transactions frequently took place in the stairwells of ████████ due to the lack of cameras. He proceeded to enter the building from the opened rear door and walk up Stairwell B from the basement level to the lobby level. When he did not find either individual in Stairwell B, Respondent walked up to the second level, exited Stairwell B, and crossed over to Stairwell A. Respondent testified that he peered through the glass window of the second level door to Stairwell A, looked down, and spotted Person A and Person B inside Stairwell A near the door to the lobby level. Respondent claimed that he observed Person A hand Person B currency. Person B proceeded to open the stairwell door to look around the lobby, and then separated from Person A to walk up the staircase. Respondent removed his head from the window to remain undetected, and briefly lost sight of the

---

[1] Respondent provided video footage, recorded a few weeks prior to the February 3, 2020 trial date, in which he demonstrated a walkthrough of his alleged route taken on April 10, 2018 (Resp. Ex. D2).

heard Person B's footsteps as he walked up and back down the stairs. Respondent claimed that he looked into the window again, and observed Person B hand Person A several items by touching hands. Respondent then exited the building through the rear, and informed his team of the positive drug transaction over the radio. He witnessed an officer arrest Person A, and find narcotics on her person. Respondent maintained that the information he provided for the observation ghost report, arrest reports, and criminal court affidavits regarding the incident were accurate.

(Tr. 333, 338-353, 382, 385-388, 391-393, 466, 470-477)

Respondent further testified at trial that in his official Department interview on May 2, 2019, he could not recall any details regarding the alleged drug transaction at █████████. He also could not recall if he was the unidentified individual who entered the building immediately after Person A and Person B and got on the elevator. Respondent stated in his interview that it could be him in the video (Dept. Ex. 16A) as he admittedly wore similar clothing. In his trial testimony, however, Respondent definitively denied that he was the unidentified individual who got on the elevator. (Tr. 379-380, 384, 481, 483)

B. ██████████████

Detective Crevatas also testified regarding the events of May 17, 2018. On that date, Respondent made radio transmissions where he informed the team of two separate observation sales, and provided descriptions of the individuals involved. Person E, Person F, Person C, and Person D were arrested by Crevatas based on the information provided by Respondent. Crevatas prepared arrest reports (Dept. Ex. 7-10) and drafted criminal court affidavits (Dept. Ex. 11-13), in reliance on Respondent's information, including Respondent's Observation – Ghost Report (Dept. Ex. 6). (Tr. 25-26, 29-42, 52)

DETECTIVE JOSEPH FRANCO

Sergeant Valdez testified that he investigated the May 17, 2018 incident.  As part of his investigation, Valdez reviewed the video surveillance footage in connection with the two drug transactions that allegedly occurred at █████████████ (Dept. Ex. 16B). (Tr. 81-82, 84, 105)

In the footage regarding the first alleged sale, Respondent can be seen riding a bicycle around the courtyard area near the entrance to █████████████ from 00:23 to 00:34.  At 01:05, Person E turns from █████████ into the courtyard area and walks to the front entrance, where he paces back and forth while waiting to gain access into the building. Respondent continues to circle on his bicycle near the sidewalk on █████████.  At 04:35, Person E walks into the building.  After briefly entering and exiting the elevator, Person E walks up the lobby stairs that are situated directly across from the building's front door.  At 05:25, Person E walks down the stairs and opens the front door to allow two males and one female to enter the building.  Person E and the two males proceed up the stairway.  At 08:17, Respondent can be seen riding his bicycle on the pathway towards █████████ and passing the building's entrance.  Person E exits the building at 08:47 and walks to the left, with Respondent riding his bicycle behind Person E towards █████████. (Dept. Ex. 16B)

A separate video containing additional footage for that time period also was introduced into evidence. (Resp. Ex. B)  In the first part of that footage, which shows █████████ looking north, Respondent is on the sidewalk circling the area on his bicycle.  At 02:05, Person E turns left from █████████ onto the pathway, and walks toward the entrance ███ █████████.  Respondent briefly stops his bicycle, and appears to observe Person E walking to the entrance; he then resumes circling with occasional pauses before the recording ends at 04:31.  The second part of the footage picks up a few minutes later, with Respondent

again circling the sidewalk area near ████████. At about 00:14, Respondent travels down

the pathway towards the entrance ████████. At 00:58, Person E can be seen

walking up the pathway towards ████████, with Respondent following closely behind on

his bicycle. Person E veers towards the left, while Respondent continues riding straight to

████████, before turning left and following in Person E's direction. (Resp. Ex. B)

In the Department's video regarding the second alleged sale, Person F walks to the front

entrance ████████ at 09:30, and waits outside while talking on a cell phone.

Respondent is riding his bicycle, circling the sidewalk area near ████████. At 11:02,

Person C walks down the stairway to the lobby area, opens the door for Person F to enter the

building, and they proceed upstairs. At 11:44, Respondent appears on his bicycle, circling the

sidewalk near ████████. He stops and remains stationary on the sidewalk near ████████

████ at 11:58 until Person F exits the building at 12:44, at which point Respondent begins

riding to the left on ████████. After exiting the building, Person F walks to the right, and about

20 seconds later Respondent rides down the pathway past the front entrance of the building in

the same direction that Person F is walking. (Dept. Ex. 16B)

Several photographs showing the front ████████, and the surrounding

area, were introduced into evidence (Dept. Ex. 17, Resp. Ex. A, C, E). A ████████

████████ map showing an aerial view of the area was received in evidence as well

(Resp. Ex. F). Respondent marked his route on this map, indicating where he had cut through

on the pathway.

Respondent testified that on May 17, 2018, he observed two separate narcotics

transactions at ████████. After receiving several complaints of narcotics sales

occurring at ████████, Respondent and his field team conducted a narcotics

DETECTIVE JOSEPH FRANCO

operation at that location. Respondent was riding his bicycle on ▇▇▇▇▇ when he witnessed a male (later determined to be Person E) approach the building's front door. Person E was standing outside of the entrance and looking up at the windows while he waited to gain access to the building. (Tr. 396-398)

Respondent testified that he rode his bicycle into the courtyard area, down the pedestrian pathway toward ▇▇▇▇▇, just past the front entrance of the building. He stated that he stopped and positioned himself on the pathway, approximately 45 feet from the front entrance of the building, where he observed Person E interact with two individuals (later determined to be Person C and Person D) through the glass doorway. Respondent claimed that, from his vantage point, he was able to look through the windows of the front door and see the three individuals standing next to one another in the building's hallway, which was up four steps and three-to-five-feet down the hall. Respondent testified that he witnessed Person E exchange currency for narcotics, and proceeded to inform his team over the radio that he observed a positive transaction and that Person E was travelling south on ▇▇▇▇▇. Person E was subsequently arrested, and narcotics were recovered from his person. (Tr. 416-420, 423-424, 498-500)

Approximately 20 minutes after this arrest, Respondent resumed his surveillance ▇▇▇▇▇ ▇▇▇▇▇. While riding his bicycle, Respondent observed a female (later determined to be Person F waiting outside of the building's entrance for a brief time until she gained access when Person C opened the door. Respondent claimed that he rode his bicycle west on the ▇▇▇▇▇ sidewalk, turned onto ▇▇▇▇▇ toward ▇▇▇▇▇, and turned onto the pathway that cuts through the ▇ and ▇▇▇▇▇ buildings, which positioned him approximately 45 feet away from the building's front door, the same vantage point from which

he claimed to have seen the sale to Person E.[2]  Respondent testified that he was looking up into the windows above the building's front door, and observed Person F with two individuals (later determined to be Person C and Person D) engage in a drug transaction by the window on the ███████████ floor of the building.  Respondent claimed that he had a clear view of the faces of the individuals involved in the transaction.  Respondent relayed the information over the radio, and provided the direction that Person F was travelling.  He witnessed another officer apprehend Person F, and find narcotics on her person.  Respondent maintained that the information he provided for the observation ghost report, arrest reports, and criminal court affidavits regarding both of the alleged drug transactions were accurate. (Tr. 424-426, 428, 430-434, 450, 455-458, 501-502, 506, 511)

Respondent also testified at trial that in his official Department interview on May 2, 2019, he could not recall any details regarding the two alleged drug transactions at ██ ██████████ (Tr. 393-394, 507)

C.  Character Witnesses

A number of character witnesses testified on Respondent's behalf.  Lieutenant Washington Zurita testified that Respondent was under his supervision for over one year.  He described Respondent as "one of the best detectives, best officers" because "he had an eye in seeing sets, seeing locations, who was out there dealing, he had like a sixth sense in regards to that." (Tr. 243, 245)  Detective Logan Payano testified that he worked with Respondent at Manhattan South Narcotics for two-and-a-half years, and was present for the April 10, 2018, incident where he arrested Person A  Respondent was "incredibly dedicated to his work," adept

---

[2] Respondent provided video footage, recorded a few weeks prior to the February 3, 2020 trial date, in which he demonstrated a walkthrough of his alleged route taken on May 17, 2018, in connection with the incident (Resp. Ex. D1).

blending in at a location. (Tr. 252-53, 259)  Detective Jawuan Hubbard testified that he worked

with Respondent for one year at Manhattan South Narcotics. He described Respondent as "the

best cop [he] ever worked with." He noted that with his ability "to dissect, diagnose drug-prone

locations, he was more effective at getting into areas that our undercovers couldn't get into." (Tr.

261-62, 264) Detective Edwin Martinez testified that he and Respondent grew up in the same

neighborhood, and he worked as Respondent's undercover partner from 2014 to 2016 in ▮▮

▮▮▮▮▮ where they were involved in hundreds of operations together.  He described Respondent

as a "good undercover" and "great investigator" with an ability to blend in while working as an

undercover or ghost. (Tr. 305-309)

The charges against Respondent will now be considered separately for each of the two

locations.

▮▮▮▮▮▮▮▮▮▮▮

Specifications 1-4 charge Respondent with making false statements, in which he claimed

that he witnessed a drug transaction between Person B and Person A on April 10, 2018.  The

video footage, which includes the lobby area and the front entrance of ▮▮▮▮▮▮▮, shows

no sign of Respondent being in position to witness such a sale.  If Respondent was the individual

who followed Person B and Person A into the building and entered the elevator, which he denied,

then he would not have been capable of seeing a sale from that vantage point either.

Faced with this video evidence at trial, Respondent offered an explanation for how he

did, in fact, witness the drug sale.  Specifically, he claimed that, after overhearing a drug-related

conversation between Person A and Person B on ▮▮▮▮▮▮▮, Respondent anticipated, from

his experience and familiarity with the area, that the two individuals were intending to conduct a

drug transaction inside a stairwell at ▮▮▮▮▮▮▮.  Respondent, who was on a bicycle, rode

ahead to the rear basement entrance of the building, then walked up Stairwell B to the lobby level. When he did not observe Person Λ and Person B in Stairwell B, Respondent walked up to the second floor and crossed over to the door of Stairwell Λ. Looking through the window of that door, Respondent testified that he observed a drug sale take place between Person Λ and Person B inside the stairwell one floor down.

This testimony, however, is in stark contrast to the initial accounts provided by Respondent regarding his observations. The arrest reports for Person Λ and Person B, which Crevatas testified he prepared based on information provided by Respondent, both indicate that the sale took place in the lobby, with no mention of a stairwell. In neither appearance before the Grand Jury does Respondent mention that the sale took place inside a stairwell. Counsel for Respondent argues that such omissions are not probative, since Respondent was asked only general questions. However, on page 7 of his May 30, 2018 Grand Jury testimony (Dept. Ex. 15), Respondent provides a more detailed answer as to where he claims he saw the exchange take place: he describes seeing Person B leave the lobby area, walk around the corner, then return to Person Λ and complete the transaction. This account is consistent with the arrest report, which
indicates that the sale took place in the lobby, but at odds with Respondent's trial testimony stating that the transaction occurred in the stairwell.

Additionally, Respondent's trial testimony is inconsistent with his Grand Jury testimony in another significant way. In each of his appearances before the Grand Jury, Respondent asserted that he followed Person Λ and Person B to ███████████ after he overheard them discussing a drug transaction. However, at trial Respondent claimed that he overheard Person Λ and Person B discussing a drug sale, and proceeded to ride ahead of them to ███████████ because he anticipated that this was the location where the drug transaction was to take place.

DETECTIVE JOSEPH FRANCO                                                          15

     After carefully considering the totality of the evidence, including the video footage and

the discrepancies in Respondent's accounts, I conclude that Respondent did not actually see a

drug transaction occur.  Respondent initially provided a simple version of events, claiming that

he followed the individuals to the building and observed the transaction take place in the lobby.

However, when faced with video footage showing that both individuals walked off to the right-

side hallway, that no transaction occurred in the lobby, and that Respondent, himself, was not

anywhere in the vicinity of the lobby, Respondent needed to modify his story for trial.  He

moved the location of the sale to the stairwell, which enabled him to claim he witnessed the

exchange from the floor above.  However, Respondent could not continue to maintain that he

followed Person A and Person B to the building because that would not have provided him with

enough time to get in position to view the sale.  So Respondent again modified his story,

claiming that he anticipated the location of the sale and rode to the building ahead of Person A

and Person B in order to take up his position on the second floor.

     This tribunal is mindful that drugs were recovered from Person A and Person B, which is

indicative that a sale may, in fact, have taken place.  However, even if a sale did occur, that does

not mean that Respondent actually witnessed it.  From his extensive experience in dealing with

narcotics transactions, as repeatedly emphasized by him and his colleagues, Respondent might

very well have seen enough to correctly predict that Person A and Person B were likely to

engage in a drug sale.  However, even if such an exchange did take place, the credible evidence

has established that Respondent, himself, did not witness it.  As such, I find that his statements

about what he observed, on the day of the incident, at the two Grand Juries, and in his trial

testimony, were all deliberately fabricated in order to justify the arrests of these two individuals.

With that in mind, we turn to the first four specifications.

Specification 1 charges Respondent with making false entries in his Observation - Ghost Report (Dept. Ex. 1) regarding his observation of a narcotics-related transaction on April 10, 2018. In that report, Respondent states that he observed Person A and Person B currency in exchange for items later determined to be crack cocaine. As discussed above, the credible evidence has established that Respondent did not actually witness such an exchange. Accordingly, I find Respondent guilty of Specification 1.

Specifications 2 and 3 charge Respondent with providing Crevatas, the arresting officer, with false information regarding his observation of the alleged drug sale at ▇▇▇▇▇▇▇▇▇▇; that information led to the creation of two arrest reports for Person B and Person A, which were filed with the Department (Dept. Ex. 2 and 3), and two criminal court affidavits containing false information, which were filed with the Court of New York County (Dept. Ex. 4 and 5). Again, as discussed above, the credible evidence established that Respondent did not actually witness a narcotics sale between Person A and Person B. As such, the information Respondent provided to Crevatas, which the arresting officer relied upon in his preparation of the arrest reports and criminal court affidavits, was false, and I find Respondent guilty of Specifications 2 and 3.

Specification 4 charges Respondent with falsely testifying before the Grand Jury in New York County on April 16, 2018, and May 30, 2018. In each of his Grand Jury appearances, Respondent testified that he observed a narcotics transaction between Person A and Person B. He provided specific testimony claiming to have followed Person A and Person B to 45 Rutgers Street, where he witnessed a hand-to-hand exchange between the two individuals in the lobby. However, as discussed above, the credible evidence established that Respondent did not actually witness such an exchange. As such, Respondent's testimony before each Grand Jury was false, and I find him guilty of Specification 4.

DETECTIVE JOSEPH FRANCO                                                                    17

███████████

Specifications 5-8 charge Respondent with making false statements, in which he claimed

that he witnessed two drug transactions on May 17, 2018. As with the incident at ████████

████, the video footage, which includes the immediate area outside the building's front entrance

as well as the interior lobby area, shows no sign of Respondent being in position to witness either

of the two alleged drugs sales that occurred inside ████████████████.

Faced with this video evidence at trial, Respondent offered an explanation for how he

was, in fact, in position to witness the two transactions. Specifically, he claimed that he

positioned himself on his bicycle diagonal to the building's entrance, approximately 45 feet

away. From that vantage point, which is outside of the area captured by the Department's video

footage, Respondent was able to observe both of the drug sales. For the first alleged sale, he

claimed that he looked through the windows of the front door and saw Person E, Person C and

Person D standing next to one another in the building's hallway, which was up four steps and

three-to-five-feet down the hall. Respondent testified that he could see Person E exchange

currency for narcotics. Approximately 20 minutes later, Respondent rode his bicycle around the

corner and cut through the pathway between buildings to return back to the same location. From

there, he claimed to observe Person F, Person C, and Person D engage in a drug transaction by

the window ████████████████ of the building. Respondent claimed that he had a clear

view of the faces of the individuals involved in the transaction.

However, there is video evidence (Dept. Ex. 16B) that contradicts Respondent's

testimony regarding the alleged sale involving Person F. Specifically, a careful viewing of the

top-right portion of the video shows that during most of the time period that Person F was in the

building allegedly taking part in a drug transaction, Respondent appears to be riding his bicycle

on the sidewalk on ▮▮▮▮▮▮▮. Just seconds after Person F enters the building, Respondent can be seen either circling or stationary on his bicycle on the ▮▮▮▮▮▮ sidewalk, where he remains until Person F exits the building. From this vantage point, Respondent was not in position to make the observations he claims to have made.

This tribunal is mindful that this particular video footage does not provide a clear view of Respondent's face. However, the footage shows him riding his bicycle on ▮▮▮▮▮▮ in precisely the same way he can be seen riding in the clearer footage in evidence. Specifically, he is on the sidewalk, near the pathway leading into the courtyard, riding in small circles. He occasionally comes to a rest for short intervals, before starting up again. Indeed, at the 13:20 mark of the footage, shortly after Person F exits the building, Respondent can clearly be seen coming from the same location on ▮▮▮▮▮, riding down the pathway toward the entrance of the building. From the totality of the credible evidence, this court concludes that Respondent is the person riding the bicycle in the video; as such, his claim that he was on the pathway, 45 feet from the front door of ▮▮▮▮▮▮▮ at the time of the sale, was deliberately false.

In light of the compelling evidence refuting Respondent's account, I do not credit his testimony that he maneuvered his bicycle into position to witness, through a door window and an upstairs window, two drug sales at ▮▮▮▮▮▮. Rather, Respondent concocted a story that would allow him to claim that he observed two drug sales take place, when in fact he did not witness either sale.

Again, the fact that drugs were recovered from the alleged participants in the sales does not mean that Respondent actually observed the sales themselves. As noted above, from his extensive experience in dealing with narcotics transactions, Respondent might very well have seen enough to correctly predict that Person E and Person F were going to engage in drug buys.

However, even if such exchanges did take place, the credible evidence has established that Respondent, himself, did not witness them. As such, I find that his account about what he observed was false. With that in mind, we turn to the remaining four specifications.

Specifications 5 and 6 charge Respondent with making false entries in his NYPD Observation - Ghost DD5 Report (Dept. Ex. 6) regarding his observation of the two narcotics-related transactions on May 17, 2018. In that report, Respondent states that he observed Person E partake in a hand-to-hand exchange with Person C and Person D, and, 25 minutes later, he observed Person F in a hand-to-hand sale with the same two sellers. As discussed above, the credible evidence has established that Respondent did not actually witness either alleged drug sale. Accordingly, I find him guilty of Specifications 5 and 6.

Specifications 7 and 8 charge Respondent with providing Crevatas, the arresting officer, with false information regarding his observations of the two alleged drug sales at ███████████ ████; that information led to the creation of arrest reports for Person E, Person F, Person C, and Person D, which were filed with the Department (Dept. Ex. 7-10), as well as three criminal court affidavits containing false information, which were filed with the Court of New York County (Dept. Ex. 11-13). Again, as discussed above, the credible evidence established that Respondent did not actually witness narcotics sales involving the four individuals who were arrested. As such, the information Respondent provided to Crevatas, which the arresting officer relied upon to prepare and file the four arrest reports and three criminal court affidavits, was false, and I find Respondent guilty of Specifications 7 and 8.

## PENALTY

In order to determine an appropriate penalty, Respondent's service record was examined. See Matter of Pell v. Board of Educ., 34 N.Y.2d 222, 240 (1974). Respondent was appointed to

the Department on March 1, 2000. Information from his personnel record that was considered in

making this penalty recommendation is contained in an attached confidential memorandum.

Respondent has been found guilty of all eight specifications. The Advocate asks that

Respondent be dismissed from the Department. In support of that recommendation, the

Advocate cites *Disciplinary Case Nos. 2010 2753 & 2010-3188* (Sept. 21, 2015) (15-year

detective with no disciplinary record dismissed from the Department for lying about the sale of

drugs and falsifying Department paperwork; and *Disciplinary Case No. 2012-8723* (Dec. 4,

2014) (14-year detective with three prior adjudications dismissed from the Department for

falsely stating on a criminal court affidavit, arrest report, and before the Grand Jury, that he

observed a perpetrator in possession of a controlled substance).

Section 203-08 of the Patrol Guide states that "the intentional making of a false statement

is prohibited, and will be subject to disciplinary action, up to and including dismissal.

Intentionally making a false official statement regarding a material matter will result in dismissal

from the Department, absent exceptional circumstances." Here, Respondent falsely claimed that

he observed three separate drug sales, none of which he actually witnessed. The information he

provided led directly to the arrests of multiple individuals. Numerous official police reports and

criminal court affidavits were generated based on Respondent's false narrative, and Respondent

repeated his fabrications, under oath, during two separate Grand Jury appearances. Respondent's

actions are wholly inconsistent with the values and standards that the Department demands of its

officers.

This tribunal is mindful that several members of service testified as to Respondent's hard

work and dedication to the Department. Nevertheless, Respondent egregiously and irrevocably

violated the oath he swore to uphold, and separation is warranted. Taking into account the

DETECTIVE JOSEPH FRANCO                                                    21

totality of the circumstances and issues in this case, I recommend that Respondent be

DISMISSED from the New York City Police Department.

Respectfully submitted,

Jeff S. Adler
Assistant Deputy Commissioner Trials

APPROVED

APR 2 1 2020

DERMOT SHEA
POLICE COMMISSIONER

*Exhibit B*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF **BRONX**, CRIMINAL TERM -- Part 17

---

THE PEOPLE OF THE STATE OF NEW YORK

                                       **ORDER**

      -against-

                                  Ind.  **1999-2014**

**JEFFERSON, SHAMAR**

                      Defendant

---

**ALVARADO, J.**

    The motion of **Shamar Jefferson** to vacate judgment pursuant to C.P.L. 440.10(1)(h), having been received by this Court, and the petitioner having appeared through counsel, **Michael Alperstein, Esq.** on September 24 2021, and the Bronx County District Attorney's Office, having consented to the relief requested, and the Court having heard the argument of counsel, and due deliberation having been had thereon, it is

    1)  ORDERED, ADJUDGED AND DECREED that the conviction of said petitioner on 5 February 2015 for P.L. 220.31 (and related counts under this indictment, if any), is vacated pursuant to C.P.L. § 440.10(1)(h) because the defendant was denied due process of law, violative of the New York State and the United States Constitutions; it is further

    2)  ORDERED, ADJUDGED AND DECREED that the indictment is dismissed, and the conviction of said petitioner is expunged from the criminal history of said petitioner.

DATED:     Bronx, New York
              September 24 2021

                                        Hon. Efrain Alvarado
                                        A.J.S.C.



*Exhibit C*

**LOCAL NEWS**

# DAs tossing more drug cases tied to NYPD detective accused of framing innocent people



FILE – In this April 24, 2019, file photo, former New York City Police Department Detective Joseph Franco, center, leaves a Manhattan Supreme Court courtroom, in New York. Manhattan District Attorney Cyrus Vance Jr.'s office said Thursday, April 15, 2021, that in the coming weeks, it will move to vacate and dismiss about 100 cases in which ex-Detective Franco served as a key witness. (Alec Tabak via AP, File)

**by:** Aliza Chasan, Associated Press

Posted: Apr 15, 2021 / 01:32 PM EDT / Updated: Apr 15, 2021 / 01:32 PM EDT

NEW YORK — New York City prosecutors will seek to overturn scores of additional drug convictions involving an indicted former NYPD detective accused of framing innocent people in some cases.

Manhattan District Attorney Cyrus Vance Jr.'s office said Thursday that it will move in the coming weeks to vacate and dismiss about 100 cases in which Joseph Franco served as an essential witness.

P000118

Case 1:24-cv-07212-ALC Document 24 Filed 12/25/24 Page 28 of 90 #: 263

twenty-two additional NYPD officers whose misconduct, they assert, merits the dismissal of all convictions in which they played an essential role.

The twenty-two have all been convicted for lying, corruption, and other forms of misconduct and nearly all have since left the force. But many of the arrests they helped make, which led to the convictions of hundreds of New York City residents, remain on the books.

"Detective Franco's actions are simply unconscionable, but he is by no means the only corrupt NYPD officer who has engaged in such egregious behavior for personal gain at the expense of our clients," said Elizabeth Felber, a signatory to the letter and a wrongful convictions attorney with The Legal Aid Society. "Our local DAs are well aware of these 22 officers and their misconduct. Prosecutors have a legal and moral obligation to right these injustices."

Representatives for all five borough DAs and the Special Narcotics Prosecutor confirmed they are reviewing the letter, but did not comment on how they plan to respond.

Many of the officers named in the letter were convicted for crimes of dishonesty, such as perjury or planting drugs.

One detective in the letter was convicted (https://www.nytimes.com/2018/04/04/nyregion/detective-convicted-of-perjury-receives-no-jail-time.html) of lying about seeing a man selling crack cocaine on a street in Jamaica, Queens. Another pleaded guilty (https://www.manhattanda.org/da-vance-nypd-officer-convicted-of-perjury-official-misconduct-related-to-unlawful-2014-arrest/) after prosecutors determined she had made repeated false statements to secure a gun possession case in Washington Heights.

P000086

Case 1:24-cv-07212-ALC Document 24-1 Filed 05/02/23 Page 22 of 30 PageID #: 262
Case 1:24-cv-07212-ALC Document 24-1 Filed 12/25/24 Page 29 of 90



➡ The NY State Criminal Court building in lower Manhattan   John Nacion/NurPhoto/Shutterstock

Last month, Brooklyn District Attorney Eric Gonzalez and Manhattan District Attorney Cyrus Vance announced (https://gothamist.com/news/brooklyn-da-will-purge-90-convictions-involving-indicted-detective-100-more-expected-manhattan) they were moving to dismiss nearly two hundred convictions involving Joseph Franco, a veteran narcotics detective who was indicted for lying under oath in 2019. Now, a coalition of eleven wrongful conviction and public defender organizations are challenging the validity of hundreds of other convictions going back decades.

In a letter (PDF (https://legalaidnyc.org/wp-content/uploads/2021/05/Letter-5.3.21-FINAL-UPDATED.pdf)) sent to all five borough District Attorneys and New York City's Special Narcotics Prosecutors on Friday, the coalition identified

P000085

Case 1:24-cv-07212-ALC Document 24-1 Filed 12/25/24 Page 30 of 90 PageID #: 266

can live free lives."

In the meantime, the fallout from the 2019 perjury indictment against narcotics detective Joseph Franco has continued.

On Monday, Bridget G. Brennan, New York City's Special Narcotics Prosecutor, announced that her office is following the Brooklyn and Manhattan DAs and seeking the dismissal of 24 more convictions in which Franco played an essential role.

## NYC news never sleeps. Get the Gothamist Daily newsletter and don't miss a moment.

your@email. com

By submitting your information, you're agreeing to receive communications from New York Public Radio in accordance with our Terms (https://www.wnyc.org/terms/).

#POLICE MISCONDUCT [/TAGS/POLICE-MISCONDUCT]   #NYPD [/TAGS/NYPD]

#MISCONDUCT [/TAGS/MISCONDUCT]   #CORRUPTION [/TAGS/CORRUPTION]

#CONVICTION [/TAGS/CONVICTION]

**Do you know the scoop?** Comment (/news/22-nypd-officers-convicted-dishonesty-corruption-misconduct-convictions#comments) below or Send us a Tip (mailto:tips@gothamist.com)

P000089

*Exhibit D*



*www.bronxda.nyc.gov*
*www.facebook.com/BronxDistrictAttorney*
*www.twitter.com/BronxDAClark*

**DARCEL D. CLARK**
*DISTRICT ATTORNEY, BRONX COUNTY*

198 EAST 161ST STREET
BRONX, N.Y. 10451
(718) 590-2234

57-202
**For Immediate Release**
September 7, 2023

## FINAL 67 DRUG CASES CONNECTED TO EX-NYPD DETECTIVE DISMISSED
### Action Brings to 324 the Convictions Reliant on Joseph Franco That Have Been Dismissed After Review by Bronx DA's Conviction Integrity Bureau

Bronx District Attorney Darcel D. Clark today announced that a Bronx judge has dismissed the last of 324 Bronx cases connected to former NYPD Detective Joseph Franco, whose termination from the force over making false statements about narcotics arrests spurred a long-term investigation by the Conviction Integrity Bureau.

District Attorney Clark said, "This is Justice with Integrity. After the detective was fired by the NYPD in April 2020, my Conviction Integrity Bureau did an exhaustive review of Bronx cases hinging on the former detective's testimony and sworn statements. Prosecutors had relied on evidence from someone with compromised credibility, and the District Attorney cannot stand behind these convictions."

Bronx Supreme Court Justice Margaret Martin on September 6, 2023 granted the motion by defense attorneys and joined by the Bronx District Attorney's Office to dismiss 67 cases against defendants who were charged between 2011 and 2015, when Franco was an undercover narcotics detective in the Bronx. Thirty-three of those convictions were for fourth-degree Criminal Facilitation, 24 were for seventh- degree Criminal Possession of a Controlled Substance, nine were for marijuana offenses that are no longer considered crimes, and one conviction was for second-degree Criminally Using Drug Paraphernalia.

Franco was indicted in New York County in 2019 on perjury and other charges. That case was dismissed.

The review of Franco's cases was conducted by Assistant District Attorney Risa Gerson, Chief of the Conviction Integrity Bureau, and Assistant District Attorney Jennifer Russell of the Conviction Integrity Bureau. District Attorney Clark thanked Trial Preparation Assistant Kayla Santiago of the Conviction Integrity Bureau for her assistance in the case.

1

*Exhibit E*

APPENDIX

BRONX DISTRICT ATTORNEY'S STATEMENT JOINING DEFENSE MOTIONS TO
VACATE SUPREME COURT: CRIMINAL TERM

The People join the defense motions to vacate the convictions on the ground that the judgments
were obtained in violation of the defendants' constitutional right to due process of law pursuant
to C.P.L. §440.10(1)(h). Former NYPD Narcotics Detective Joseph Franco has been indicted in
New York County on multiple charges of perjury and official misconduct in connection with his
work as a narcotics detective in Manhattan in 2017 and 2018. More specifically, former
Detective Franco has been indicted on four counts of perjury for false statements that he made
during four separate Grand Jury proceedings. He is also charged with nine counts of offering a
false instrument for filing based on false information contained in police reports that he
submitted, and three counts of official misconduct for providing information that led to the
search and seizure of citizens where there was no probable cause for their seizure. These acts of
perjury, false filing, and misconduct, led to the wrongful convictions of three individuals.
Prosecutors at the Manhattan District Attorney's Office discovered Franco's wrongdoing when
they viewed surveillance video of the three locations where the purported crimes occurred. In all
three cases, Franco claimed that he had seen the defendants exchange drugs for money, but
surveillance video showed that the defendants were not visible on the video, and based on where
Franco was positioned, he could not have seen the transaction that he described and claimed,
under oath, to have seen. Although the criminal charges against Franco are currently pending,
Franco was terminated from NYPD in April 2020, after having been found guilty at a
departmental trial. The powerful and compelling evidence that Franco lied to a grand jury on
multiple occasions, falsified documents and evidence in the way that he did completely
undermines his credibility and reliability as a police witness in any prosecution involving a
similarly situated undercover or observation sale of illegal narcotics.

Former Detective Franco worked as an undercover narcotics detective in the Bronx from 2011-
2015. The Conviction Integrity Bureau at the Bronx District Attorney's Office has been
reviewing the narcotics-related convictions in which Franco played a role. These convictions are
generally based on charges relating to an alleged undercover hand-to-hand sale of narcotics, an
alleged observation sale of narcotics, or an alleged simple possession of narcotics for personal
use. The purported criminal conduct alleged by Franco in these matters occurred years before the
episodes in Manhattan where Franco committed perjury. Accordingly, Franco's misconduct and
the crimes he committed could not have been known or discovered by the People or the
defendants at the time that they were prosecuted. Nevertheless, because Franco's credibility is
now so completely compromised, we are recommending that the court vacate the narcotics-
related convictions in the cases we have identified where the prosecution materially relied on
sworn testimony or evidence supplied by Franco. These are cases where Franco, acting in his
capacity as an undercover officer, alleged either that he observed a narcotics transaction, or that
he acted as an undercover and exchanged pre-recorded buy money for drugs. In many of these
cases, there was little or no independent evidence—separate and apart from evidence that
depended on Franco's credibility— to corroborate Franco's account. The surrounding
circumstances of these cases are similar in kind and nature to the Manhattan cases in which
Franco committed perjury. Furthermore, in each of the cases we have identified, the evidence

supplied by Franco was critical and if the case were to proceed to trial today, the People would not be able to prove the defendant's guilt without calling Franco as a witness and relying upon his credibility. Franco's perjurious conduct in Manhattan under similar circumstances—while acting as a narcotics detective observing street sales—has caused us to lose confidence in his credibility in these cases and, therefore, in the reliability of the convictions. The fundamental lack of credibility in the evidence provided by a necessary government actor suggests a lack due process. Under these rare circumstances, we join the defense motions to vacate the convictions. Furthermore, taking into account the burden of proof at trial, the punishment the defendants have already served, the impact of a dismissal on the public's confidence in the criminal justice system and the welfare of the community, the People believe that the interests of the community are best served by not pursuing a further prosecution of these matters. Accordingly, in an exercise of our discretion, we move to dismiss the charges.

*Exhibit F*

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY, CRIMINAL TERM: PART 17

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

                           Respondent,    :    **Indictments**

        -against-

ADAM CONCEPCION, CICERO WILLIAMS, BRAULIO JIMENEZ, DARREN MCBRIDE, RASUL SINGLETON, JULIO SUAREZ, BACILIO TORRES, LUIS DURANT, JOSE MATIAS, MARIA ACOSTA, RENE VALENCIA, ANIKIA PARRILLA, CHRISTOPHER BROWN, DAVID CARTER, CARLOS LOPEZ, ROSINA FELICIANO, EDWIN FIGUEROA, FLETCHER DAVIS, ORLANDO ALVAREZ, RICARDO REYES, CARLOS RODRIGUEZ, ANGEL SANCHEZ, SHAMAR JEFFERSON, SHENEL GREEN, RENE VALENCIA, JOSE SOTELLO, GEORGE DENNIS, ALEXIS SANCHEZ, OLMEDO ALVARADO, RAMON HERNANDEZ, CHRISTOPHE PEREZ, RAMON TORRES, JONATHAN FLORES, ROBERT WESTIN, LUIS BAEZ, CISCO CORIL, SILVIO VARGAS, MANUEL SANCHEZ, JOSE GALEANO-VELASQUEZ.

                           Defendants-Movants.

| Indictments |
|---|
| 2519/2012, 3957/2013, 1705/2012, 3085/2015, 1219/2015, 399/2013, 566/2013, 784/2013, 905/2013, 1537/2013, 3631/2013, 1595/2013, 1717/2012, 1988/2012, 2394/2012, 2440/2012, 2499/2012, 631/2013, 1265/2013, 1265/2013, 1682/2011, 3291/2011, 1999/2014, 3729/2012, 1732/2013, 561/2015, 561/2015, 2533/2013, 35/2014, 340/2014, 1895/2013, 2047/2011, 3610/2011, 2452/2013, 1682/2011, 3364/2011, 921/2015, 92/2015, 2607/2012. |

-------------------------------------------------------------------x

## MOTION TO DISMISS

_Attorney for Defendants,_

**MICHAEL ALPERSTEIN**
**The Assigned Counsel Plan**
**253 Broadway, 8th Floor**
**New York, New York 10007**
**(212) 566-1096**

___ To

Attorney(s) for

___ Service of a copy of the within
              is hereby admitted.

Dated.

- ADAM CONCEPCION         -2519/2012
- CICERO WILLIAMS          -3957/2013
- BRAULIO JIMENEZ          -1705/2012
- DARREN MCBRIDE          -3085/2015
- RASUL SINGLETON         -1219/2015
- JULIO SUAREZ             -399/2013
- BACILIO TORRES           -566/2013
- LUIS DURANT              -784/2013
- JOSE MATIAS              -905/2013
- MARIA ACOSTA            -1537/2013
- RENE VALENCIA           -3631/2013
- ANIKIA PARRILLA          -1595/2013
- CHRISTOPHER BROWN       -1717/2012
- DAVID CARTER            -1988/2012
- CARLOS LOPEZ            -2394/2012
- ROSINA FELICIANO        -2440/2012
- EDWIN FIGUEROA          -2499/2012
- FLETCHER DAVIS           -631/2013
- ORLANDO ALVAREZ        -1265/2013
- RICARDO REYES           -1265/2013
- CARLOS RODRIGUEZ        -1682/2011
- ANGEL SANCHEZ           -3291/2011
- SHAMAR JEFFERSON        -1999/2014
- SHENEL GREEN            -3729/2012
- RENE VALENCIA           -1732/2013
- JOSE SOTELLO            -561/2015
- GEORGE DENNIS           -561/2015
- ALEXIS SANCHEZ          -2533/2013
- OLMEDO ALVARADO         -35/2014
- RAMON HERNANDEZ         -340/2014
- CHRISTOPHE PEREZ        -1895/2013
- RAMON TORRES            -2047/2011
- JONATHAN FLORES         -3610/2011
- ROBERT WESTIN           -2452/2013
- LUIS BAEZ               -1682/2011
- CISCO CORIL             -3364/2011
- SILVIO VARGAS           -921/2015
- MANUEL SANCHEZ          -92/2015
- JOSE GALEANO-VELASQUEZ  -2607/2012

*Exhibit G*

A PROJECT OF THE UNIVERSITY OF CALIFORNIA IRVINE NEWKIRK CENTER FOR SCIENCE & SOCIETY,
UNIVERSITY OF MICHIGAN LAW SCHOOL & MICHIGAN STATE UNIVERSITY COLLEGE OF LAW



## THE NATIONAL REGISTRY
## OF EXONERATIONS

**3,622 EXONERATIONS SINCE 1989
MORE THAN 32,750 YEARS LOST**

# JULIO IRIZARRY

Other New York CIU Exonerations



On February 21, 2017, New York City police detective Joseph Franco arrested 46-year-old Julio Irizarry after Franco reported that he saw Irizarry sell drugs to an unidentified man inside the lobby of a building at 288 Delancey Street in Manhattan.

On June 28, 2017, Irizarry pled guilty in New York County Supreme Court to criminal possession of a controlled substance in the third degree. He was sentenced three years in prison to be served concurrently with a five-year sentence that was imposed in a separate unrelated drug case.

In 2018, Franco came under investigation by the New York County District Attorney's Office after video from a surveillance camera in the lobby showed that on the afternoon of his arrest, Irizarry entered 288 Delancey Street, went upstairs to another floor, then came back down and left the building in less than a minute.

There was no drug sale in the lobby. In addition, video from outside the building showed that after Irizarry went inside, Franco walked straight past the building without going near the entrance, making it impossible for the Franco to have seen anything inside the lobby.

On December 5, 2018, after an investigation by the New York County District Attorney's Office, prosecutors asked that Irizarry's conviction be vacated and the charges were dismissed. The prosecution also agreed to reduce Irizarry's separate five-year sentence to 3.5 years.

In April 2019, Franco was indicted on 16 counts, including perjury and official misconduct for framing Irizarry and two other people—Turrell Irving and Tameeka Baker. The charges against Franco were dismissed by a judge in 2023, after he found that prosecutors had failed to turn over evidence to Franco's attorneys.

– *Maurice Possley*

Report an error or add more information about this case.

Posting Date: 6/6/2019
Last Updated: 2/1/2023

| | |
|---|---|
| **State:** | New York |
| **County:** | New York |
| **Most Serious Crime:** | Drug Possession or Sale |
| **Additional Convictions:** | |
| **Reported Crime Date:** | 2017 |
| **Convicted:** | 2017 |
| **Exonerated:** | 2018 |
| **Sentence:** | 3 years |
| **Race/Ethnicity:** | Hispanic |
| **Sex:** | Male |
| **Age at the date of reported crime:** | 46 |
| **Contributing Factors:** | Perjury or False Accusation, Official Misconduct |
| **Did DNA evidence contribute to the exoneration?:** | No |

*Exhibit H*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX, CRIMINAL TERM -- Part 17

THE PEOPLE OF THE STATE OF NEW YORK

                                             ORDER

       -against-

                                      Ind.  **1999-2014**

**JEFFERSON, SHAMAR**
                   Defendant

**ALVARADO, J.**

     The motion of **Shamar Jefferson**  to vacate judgment pursuant to C.P.L. 440.10(1)(h), having been received by this Court, and the petitioner having appeared through counsel, **Michael Alperstein, Esq.** on September 24 2021, and the Bronx County District Attorney's Office, having consented to the relief requested, and the Court having heard the argument of counsel, and due deliberation having been had thereon, it is

    1)  ORDERED, ADJUDGED AND DECREED that the conviction of said petitioner on 5 February 2015 for P.L. 220.31 (and related counts under this indictment, if any), is vacated pursuant to C.P.L. § 440.10(1)(h) because the defendant was denied due process of law, violative of the New York State and the United States Constitutions; it is further

    2)  ORDERED, ADJUDGED AND DECREED that the indictment is dismissed, and the conviction of said petitioner is expunged from the criminal history of said petitioner.

DATED:     Bronx, New York
              September 24 2021

                                            Hon. Efrain Alvarado
                                          A.J.S.C.



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX, CRIMINAL TERM -- Part 17

---

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ORDER

Ind.  **0556-2013**

**TORRES, BACILIO**

Defendant

---

**ALVARADO, J.**

The motion of **Bacilio Torrres** to vacate judgment pursuant to C.P.L. 40.10(1)(h), having been received by this Court, and the petitioner having appeared through counsel, **Michael Alperstein, Esq.** on September 24, 2021, and the Bronx County District Attorney's Office, having consented to the relief requested, and the Court having heard the argument of counsel, and due deliberation having been had thereon, it is

1)  ORDERED, ADJUDGED AND DECREED that the conviction of said petitioner on 7 May 2014 for P.L. 220.03 (and related counts under this indictment, if any), is vacated pursuant to C.P.L. § 440.10(1)(h) because the defendant was denied due process of law, violative of the New York State and the United States Constitutions; it is further

2)  ORDERED, ADJUDGED AND DECREED that the indictment is dismissed, and the conviction of said petitioner is expunged from the criminal history of said petitioner.

DATED:      Bronx, New York
            September 24, 2021




Hon. Efrain Alvarado
A.J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX, CRIMINAL TERM -- Part 17

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ORDER 2410-2012

Ind.  2240-2012

**FELICIANO, ROSINA**

            Defendant

**ALVARADO, J.**

The motion of **Rosina Feliciano** to vacate judgment pursuant to C.P.L. 440.10(1)(h),
having been received by this Court, and the petitioner having appeared through counsel, **Michael
Alperstein, Esq.** on September 24 2021, and the Bronx County District Attorney's Office, having
consented to the relief requested, and the Court having heard the argument of counsel, and due
deliberation having been had thereon, it is

1)  ORDERED, ADJUDGED AND DECREED that the conviction of said petitioner on

7 November 2013  for P.L. 220.31 (and related counts under this indictment, if any), is

vacated pursuant to C.P.L. § 440.10(1)(h) because the defendant was denied due process

of law, violative of the New York State and the United States Constitutions; it is further

2)  ORDERED, ADJUDGED AND DECREED that the indictment is dismissed, and the

conviction of said petitioner is expunged from the criminal history of said petitioner.

DATED:      Bronx, New York
            September 24 2021

Hon. Efrain Alvarado
A.J.S.C.
EFRAIN ALVARADO

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX, CRIMINAL TERM -- Part 17

---

THE PEOPLE OF THE STATE OF NEW YORK

                                                ORDER

        -against-                        Ind.    **1219-2015**

**RESTITUYO, AYLYN**

                              Defendant

---

**ALVARADO, J.**

        The motion of **Aylyn Restituyo**   to vacate judgment pursuant to C.P.L. 440.10(1)(h),
having been received by this Court, and the petitioner having appeared through counsel, **Justine
Luongo, Esq.** on September 24, 2021, and the Bronx County District Attorney's Office, having
consented to the relief requested, and the Court having heard the argument of counsel, and due
deliberation having been had thereon, it is

        1)  ORDERED, ADJUDGED AND DECREED that the conviction of said petitioner on

        4 April  2018 for P.L. 220.39(1) (and related counts under this indictment, if any), is

        vacated pursuant to C.P.L. § 440.10(1)(h) because the defendant was denied due process

        of law, violative of the New York State and the United States Constitutions; it is further

        2)  ORDERED, ADJUDGED AND DECREED that the indictment is dismissed, and the

        conviction of said petitioner is expunged from the criminal history of said petitioner.

DATED:        Bronx, New York
              September 24, 2021

                                        Hon. Efrain Alvarado
                                        A.J.S.C.

                                        **HON. EFRAIN ALVARADO**

# *Exhibit I*

NEW YORK          News      Weather      Sports      Video      New York Shows      Your Home Team                    44°

LOCAL NEWS

## Trial of former NYPD detective Joseph Franco, accused of perjury and misconduct, continues



By Jessica Moore
January 24, 2023 / 6:02 PM EST / CBS New York



### Be the first to know

Get browser notifications for breaking news, live events, and exclusive reporting.

...tive, is on trial, accused of
...tions.

Prosecutors say the undercover narcotics detective exhibited a pattern of lying about what he saw to secure arrests, sending innocent people to jail and jeopardizing hundreds of cases.

Franco, 50, sat in court Tuesday charged with six counts of perjury, five counts of official misconduct, and 15 counts of providing false documents to a public official.

He is accused of falsely claiming he saw drug deals go down in three cases between 2017 and 2018.

**READ MORE:** <u>Opening statements begin in perjury trial of former NYPD detective Joseph Franco</u>

AD



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

On the stand today, Timothy Hiel, a former assistant district attorney, testified he would never have prosecuted one defendant for selling cocaine without Franco's story that he personally witnessed the sale.

Prosecutors say in 2018, Franco perjured himself before a grand jury, repeating the lie that he witnessed a drug buy that he could not have physically seen.

Hiel said he later watched surveillance video of the alleged drug buy, which he saw no evidence of.

Franco's defense attorney says he is being prosecuted for doing his job, which is to "disappear in plain sight," adding that the surveillance video being used to prove Franco's guilt actually proves he was a good cop, and that it was not uncommon for him to be alone where no one knew where he was or what he could see.

More than 500 cases connected to Franco in Manhattan, Brooklyn, and the Bronx have been dismissed over his alleged actions.

If convicted, he faces up to seven years in prison.

Franco was an NYPD detective for 20 years. He was fired in May 2020 following a departmental trial.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

and in trial

traffic stop







*Exhibit J*



Trash    Search in trash...    Advanced ∨

← Back    Restore to Inbox    Move    Delete    Spam    •••    ▲    Settings ⚙

**Barnes - Response to Demand**    Yahoo Mail/Trash ☆

Corsi, Alexandra (Law) <acorsi@law.nyc.gov>    Fri, Nov 3 at 4:00 PM ☆
To: rudy velez

Good afternoon, Rudy:

In response to the demand of $900,000.00 that you conveyed this afternoon on the Donneal Barnes case, the City can offer $682,500.00, which equates to $195k/year for the time your client spent in custody, and we can settle this case today for that amount. This offer is contingent on our standard paperwork, which also includes the general release, affidavit of status of liens, and W-9 forms. As noted yesterday at the conference, despite the issues there might be with the defendant officer, he is not currently a party and there's a question whether the City would even be on the hook in this case given the officer's history. Accordingly, seeking any judgment from the officer would be unlikely to result it anything for your client. Moreover, your client pled guilty for the underlying crime and did not appeal his conviction, which is a fact that will likely work in the City's favor. Please let me know.

Thank you,

Alexandra Corsi
Senior Counsel
New York City Law Department
100 Church Street
New York NY 10007
T: 212-356-3545
acorsi@law.nyc.gov

# *Exhibit K*

ASUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY, CRIMINAL TERM: PART 17
-----------------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

                                            Respondent,              **NOTICE OF**

                                                                    **MOTION**

                              -against-

                                                            Indictment 1999/2014
SHAMAR **JEFFERSON,**

                                       Defendant-Movant.

-----------------------------------------------------------------------------------x


**PERSONS:**

    **PLEASE TAKE NOTICE,** that upon the annexed affirmation of **MICHAEL ALPERSTEIN, ESQ.,** the administrator of the Assigned Counsel Plan, assigned to the defendant herein, and upon all proceedings herein, the undersigned will move this Court at Part 17 of the   Supreme Court, Bronx County, New York on the 14th day of September 2021, at 9:30 a.m., or as soon thereafter as counsel may be heard for an Order:

        1.     Dismissing the in accusatory instruments on the basis that the offenses charged are unconstitutional as they are applied against the defendants in that they violate their rights under the U.S. Constitution and Article I, Sec. 8 of the New York State Constitution.

1

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY, CRIMINAL TERM: PART 17
-----------------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

                                 Respondent,        **AF**

               -against-

                                             Indictmer

SHAMAR JEFFERSON,

                                Defendant-Movant.

-----------------------------------------------------------------------------------x

        Michael Alperstein, an attorney admitted to practice in the courts (

hereby affirms, under the penalties of perjury, that the following statements

are believed to be true:

        1. I am the Administrator of the Assigned Counsel Plan for the

Department ("the panel"). The panel was assigned to represent the defenc

Jefferson, on the above referenced indicted matter and the panel assigned

an attorney on the panel. A panel attorney represented the Mr. Jefferson (

enumerated indictment. A judgment of conviction was entered on the c

2.   And for such other and further relief as the Court may deem just

and proper.

DATED: NEW YORK, NEW YORK
On this 27th day of August 2021.

YOURS, etc.,

MICHAEL ALPERSTEIN, ESQ.
Attorney for Defendants
253 Broadway, 8th Floor
New York, New York 10007

TO:     HON.  DARCEL D. CLARK
District Attorney, Bronx County
265 East 161st Street
Bronx, New York 10451

CLERK, SUPREME COURT
Bronx County
265 East 161st Street
Bronx, New York 10451

2

motion to vacate the judgment of conviction and to dismiss the underlying

instruments pursuant to C.P.L. §§ 440.10(1)(h), because the defendant's

rights were violated because Detective Joseph Franco played an esser

his/her prosecution, and his/her conviction is irrevocably tainted as a result.

3.    In 2019, Detective Joseph Franco was indicted by a New \

grand jury on twenty-six charges, including perjury and official misconduct,

revealed that he testified under oath to multiple drug sales that videotape

showed did not take place.

4.    Detective Franco was subsequently found guilty at an admini

within the police department. As a result of this conviction, Detective Franc

from the New York City Police Department.

5.    Detective Franco played a key role in the arrest and prosec

defendant, who were arrested, charged, and ultimately convicted of the

Criminal Sale of a Controlled Substance in the Fifth Degree, P.L. 220.31, a

Detective Franco's participation in supporting the allegation.

6.    Because of Detective Franco's essential role in these prose

## CONCLUSION

7.  We now move to vacate each of these convictions as a result of th

of the defendant's constitutional right to due process.  C.P.L. §§ 440.10(1)(h)


WHEREFORE, it is respectfully requested that this Court vacate ea

conviction[s] and dismiss the accusatory instruments with prejudice.


Dated: New York, New York
August 27, 2021

*Michael Alperstein*
Michael Alperstein, Esq.

*Exhibit L*

CRIMINAL COURT OF THE CITY OF NEW YORK
BRONX COUNTY

THE PEOPLE OF THE STATE OF NEW YORK

v.

1. SHAMAR JEFFERSON M/24
   a.k.a. SNYDER
   Arrest# B14636754

2. DARYL MACKEY M/41
   Arrest# B14636752

Defendants

STATE OF NEW YORK

COUNTY OF THE BRONX

2014BX027808



PO MICHAEL MCCARTHY of NARCBBX, Shield# 2223, states that on or about May 23, 2014 at approximately 6:00 PM at In the vicinity of 1080 Anderson Avenue, County of the Bronx, State of New York,

THE DEFENDANTS, ACTING IN CONCERT, COMMITTED THE OFFENSES OF:

1 (F) P.L. 220.39(1)       Criminal Sale of a Controlled Substance 3^
                           DQO

2 (M) P.L. 220.03          Criminal possession of a controlled
                           substance in the seventh degree 2 CTS DQO

3 (V) P.L. 221.05          Unlawful Possession of Marijuana

IN THAT THE DEFENDANTS, ACTING IN CONCERT, DID: knowingly and unlawfully sell a narcotic drug; knowingly and unlawfully possesses a controlled substance and knowingly and unlawfully possess marijuana.

THE GROUNDS FOR THE DEPONENT'S BELIEF ARE AS FOLLOWS:

Deponent is informed by UNDERCOVER POLICE OFFICER, that at the above time and place, informant observed defendant DARYL MACKEY and SHAMAR JEFFERSON acting in concert in that informant observed separately apprehended DIANA RAMIREZ (Arrest #B14636759) approach defendants and engage defendants in brief, drug-related conversation, in that separately apprehended RAMIREZ stated in sum and substance I NEED THREE, and defendants replied in sum and substance GIVE US THE MONEY.

Deponent is further informed by the informant that separately apprehended RAMIREZ handed defendant MACKEY a sum of United States currency, and in exchange defendant MACKEY handed separately apprehended RAMIREZ a small object.

Deponent further states that separately apprehended RAMIREZ had on her

includes training in the recognition of controlled substances and their packaging, the aforementioned substances are alleged and believed to be CRACK/COCAINE, and CRACK/COCAINE residue respectively.

Deponent further states that defendant JEFFERSON had on his person, in his front waistband, four (4) black plastic twists containing a white rock-like substance, and one (1) plastic twist containing a dried, green leafy substance with a distinctive odor.

Deponent further states, that based upon deponent's training and experience, which includes training in the recognition of controlled substance and marijuana, a dried, green leafy substance with a distinctive odor, and their packaging, the aforementioned substances are alleged and believed to be CRACK/COCAINE and MARIJUANA, respectively.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE
AS A CLASS A MISDEMEANOR PURSUANT TO P.L. 210.45

5/24/14   18:15
DATE and TIME                    SIGNATURE

# *Exhibit M*



# OFFICE OF THE DISTRICT ATTORNEY, Bronx County

**ROBERT T. JOHNSON**
**DISTRICT ATTORNEY**

198 East 161st Street
Bronx, New York 10451

(718)590-2000
www.bronxda.nyc.gov

_____X
The People of The State Of New York

        -against-

B14636754  JEFFERSON, SHAMAR  M/24
B14636752  MACKEY, DARYL  M/41
_____X

Notice Pursuant
To CPL 710.30(1)(b)

Please take notice that identification procedures were conducted by a public servant engaged in law enforcement activity or by a person acting under the direction of or in cooperation with such a public servant. Please take further notice that the People intend to offer evidence of the below identification procedures on the People's direct case at a Suppression Hearing and/or at trial of this action.

| Defendant's Name | JEFFERSON, SHAMAR |
|---|---|
| WT | UCI |
| ID made to PO | PO MCCARTHY, MICHAEL |
| Date & Time | 05/23/2014 18:50 |
| Location | In front of 1055A Anderson Avenue |
| Type | Point Out |
| Result | Positive |

| Defendant's Name | MACKEY, DARYL |
|---|---|
| WT | UCI |
| ID made to PO | PO MCCARTHY, MICHAEL |
| Date & Time | 05/23/2014 18:50 |
| Location | In front of 1055A Anderson Avenue |
| Type | Point Out |
| Result | Positive |

# *Exhibit N*

**The New York Times**      https://www.nytimes.com/2019/04/24/nyregion/nyc-detective-perjury-franco.html

# Detective's Lies Sent Three People to Prison, Prosecutors Charge

A veteran narcotics detective testified falsely about drug deals he claimed to have seen in at least three cases, the Manhattan district attorney's office said.

 By Sean Piccoli

April 24, 2019

Detective Joseph E. Franco is a 19-year veteran in the narcotics division in Manhattan with thousands of arrests to his credit. His testimony has sent numerous people to prison.

Among them were three New Yorkers that Detective Franco said he saw selling drugs in separate cases in 2017 and 2018. All three pleaded guilty.

Two were sent to state prison and were behind bars when investigators from the Manhattan district attorney's office discovered that the detective's accounts — filed in arrest reports, and repeated to other officers, prosecutors and grand juries — were fabricated.

On Wednesday, Detective Franco, who works in southern Manhattan, was charged with 16 criminal counts, including perjury and official misconduct.

Prosecutors said Detective Franco fabricated tales of drug buys by innocent people. His lies unraveled when investigators found video evidence contradicting the detective's accounts and after interviewing other arresting officers, prosecutors said in court papers filed with the case.

Detective Franco, 46, pleaded not guilty to the charges in State Supreme Court in Manhattan on Wednesday afternoon. Justice Mark Dwyer released him without bail until his next court date on June 28.

Detective Franco and his lawyer, Howard Tanner, declined to comment as they left the courthouse.

The convictions against the three people Detective Franco said had sold drugs — Julio Irizarry, Tanzeeka Baker and Turell Irving — have been thrown out, and none of the three are in state custody anymore, said Justin Henry, a spokesman for the Manhattan district attorney, Cyrus R. Vance Jr.

At a bail hearing on Wednesday, an assistant district attorney, Stephanie Minogue, said that the office was investigating at least two other cases involving Detective Franco and that more indictments might be filed against him. She asked for $50,000 cash bail, a request Justice Dwyer denied.

Detective Franco has now been suspended without pay, the Police Department said.

"Our N.Y.P.D. officers swear an oath to uphold the law, and meet the highest ethical standards," the police commissioner, James P. O'Neill, said in a statement. "Should an officer fail to meet those critical expectations, they must be held accountable."

Prosecutors said Mr. Irizarry was the first to be accused of making a drug sale that Detective Franco, working as a plainclothes detective, claimed he had witnessed.

Mr. Irizarry was arrested in February 2017 after the detective said he saw him selling drugs inside the lobby of a building on Delancey Street, prosecutors said in a court document.

But video from a security camera inside the building showed that no such transaction took place. Additionally, video from a security camera outside the building showed Detective Franco never entered the building, leaving him unable to see anything in the lobby, the document said.

This pattern was repeated on two other occasions. Ms. Baker was arrested in June 2017 on Madison Street after Detective Franco said that he saw Ms. Baker selling drugs in a building's vestibule, the document said.

Yet investigators found security video showing that Ms. Baker went into the building without stopping in the vestibule, and that Detective Franco was not close enough to her to actually see what she was doing, the document said.

In April 2018, Mr. Irving was arrested on Detective Franco's word that he had seen him giving cocaine to a woman, Karen Miano, who subsequently sold the drug to an undercover officer, the document said.

PLAINTIFF'S EXHIBIT 6

"Once more, the video from this incident directly contradicted the defendant's version of events," according to the document. "There was no drug transaction between Mr. Irving and Ms. Miano. Instead, Ms. Miano simply held the door open for Mr. Irving as he entered the building and she exited on her way to meet the undercover officer."

"In each of the cases, the defendant compounded his misconduct by repeating these lies over and over again," Ms. Minogue, the prosecutor, said in court.

The review of Detective Franco's cases began last summer, when the district attorney's staff noticed major inconsistencies in the detective's statements and the underpinning evidence in his casework, Mr. Henry said.

After vacating the convictions of Mr. Irizarry, Ms. Burke and Mr. Burrell, the lawyers from the district attorney's Conviction Integrity Program referred Detective Franco's case to the Public Corruption Unit for investigation, Mr. Henry said.

Ms. Baker and Mr. Irizarry were both serving state prison sentences when the evidence came to light showing the detective's testimony in their cases was false, the court documents said.

In a statement, the district attorney's office said the case against Detective Franco was part of a continuing effort to root out and prosecute police corruption and misconduct.

"My office will continue to bring the full weight of the law against uniformed officers who lie and undermine the public trust in law enforcement on which we rely to keep New York safe," Mr. Vance said in the statement.

Ali Winston contributed reporting.

PP0000130

# *Exhibit O*

7/18/24, 2:23 ... We fabricated drug charges against innocent people to meet arrest quotas, former detective testifies – New...

NEWS > NEW YORK NEWS

# We fabricated drug charges against innocent people to meet arrest quotas, former detective testifies



Willie Anderson/News

Former Detective Stephen Anderson, seen here in 2009, is testifying under a cooperation agreement with prosecutors.

7/18/22, 2:23 PM    We fabricated drug charges against innocent people to meet arrest quotas, former detective testifi… – New …



By **NEW YORK DAILY NEWS** | NYDN@medianewsgroup.com

UPDATED: January 10, 2019 at 9:16 p.m.

## Loading your audio article

A former NYPD narcotics detective snared in a corruption scandal testified it was common practice to fabricate drug charges against innocent people to meet arrest quotas.

The bombshell testimony from Stephen Anderson is the first public account of the twisted culture behind the false arrests in the Brooklyn South and Queens narc squads, which led to the arrests of eight cops and a massive shakeup.

Anderson, testifying under a cooperation agreement with prosecutors, was busted for planting cocaine, a practice known as "flaking," on four men in a Queens bar in 2008 to help out fellow cop Henry Tavarez, whose buy-and-bust activity had been low.

"Tavarez was … was worried about getting sent back [to patrol] and, you know, the supervisors getting on his case," he recounted at the corruption trial of Brooklyn South narcotics Detective Jason Arbeeny.

"I had decided to give him [Tavarez] the drugs to help him out so that he could say he had a buy," Anderson testified last week in Brooklyn Supreme Court.

He made clear he wasn't about to pass off the two legit arrests he had made in the bar to Tavarez.

"As a detective, you still have a number to reach while you are in the narcotics division," he said.

NYPD officials did not respond to a request for comment.

Anderson worked in the Queens and Brooklyn South narcotics squads and was called to the stand at Arbeeny's bench trial to show the illegal conduct wasn't limited

7/18/... Case 1:23-cv-09388-AJN-TAM ... Document 185-3 ... Filed 07/12/2013 ... Page 69 of 90 ... Ne...

\# 394

"Did you observe with some frequency this ... practice which is taking someone who was seemingly not guilty of a crime and laying the drugs on them?" Justice Gustin Reichbach asked Anderson.

"Yes, multiple times," he replied.

The judge pressed Anderson on whether he ever gave a thought to the damage he was inflicting on the innocent.

"It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators," he said.

"It's almost like you have no emotion with it, that they attach the bodies to it, they're going to be out of jail tomorrow anyway; nothing is going to happen to them anyway."

The city paid $300,000 to settle a false arrest suit by Jose Colon and his brother Maximo, who were falsely arrested by Anderson and Tavarez. A surveillance tape inside the bar showed they had been framed.

A federal judge presiding over the suit said the NYPD's plagued by "widespread falsification" by arresting officers.

jmarzulli@nydailynews.com

*Originally Published: October 13, 2011 at 4:00 a.m.*

## Around the Web

**REVCONTENT**

2011 › October › 13

*Exhibit P*

ADVERTISEMENT

STREAM EXCLUSIVE ORIGINALS    TRY BET+ FOR FREE

SHO BET VIDE CELEB MUS NEW LIFES' SHO LIVE VOT MOR

# Former New York Cop Blows Lid Off Drug-Planting Scheme

## During a corruption trial former NYPD narcotics detective Stephen Anderson testified that he and other members of his division regularly planted drugs on innocent people in order to keep up with department arrest quotas.

**NEWS**



BET TALKS: FERG GETS REAL: FROM HARLEM'S STREETS ...    ✕



AD 1/1    0:14

ADVERTISEMENT

Trending Now

agents
were up to
no good,
and now
shocking



hispanic women in New York deserve obesity care coverage

ADVERTISEMENT

**Trending Now**



JAMIE FOXX SAYS HIS DAUGHTER'S GUITAR SAVED HIS LIFE



EXPLOSIONS, BETRAYALS, AND HEATED ROMANCES: 'A...



JUDGE EASES YOUNG THUG'S ATLANTA BAN, BUT THERE'S A...

**NEWS**

**By Naeesa Aziz**
October 14, 2011 / 11:32 AM

For years, members of the Black community have claimed that many undercover drug agents were up to no good, and now shocking testimony from New York's Finest validates those claims of corruption. During a corruption trial Wednesday former New York City narcotics detective Stephen Anderson testified that the and other members of the Brooklyn South and Queens

... lanted drugs on

keep up with

in the trial of

beeny and was

tice of planting

as

arcotics

was accused of

in in a bar in

part of an

:cutors.

e a number to

BET TALKS: FERG GETS REAL FROM HARLEM'S STREETS ...



COMMON SAYS
HE MEANT IT
ABOUT
MARRYING....

reach while you are in the narcotics division," he said according to the *New York Daily News*.

Advocacy groups called the practice a result of the country's skewed objectives that stem from the war on drugs.

"One of the consequences of the war on drugs is that police officers are pressured to make large numbers of arrests, and it's easy for some of the less honest cops to plant evidence on innocent people," said Gabriel Sayegh of the Drug Policy Alliance, an organization dedicated to promoting human rights based alternatives to the drug war.

"The drug war inevitably leads to crooked policing — and quotas further incentivize such practices," he said.

The group also reports that the NYPD has arrested more than 50,000 people last year

ases — 86% of

— making

umber-one

hether he took

epercussions of

"It was

t of, whether it

lercovers and

emotion with it,

to it, they're

row anyway;

nothing is going to happen to them anyway," he said.

Two men who were framed by Anderson and his partner were paid $300,000 in a settlement with the city after surveillance taped showed the officer's misconduct.

*(Photo: Justin Sullivan/Getty Images)*

CRIMES

BET TALKS: FERG GETS REAL FROM HARLEM'S STREETS ...    ✕

arlem's Streets to Global Spotlight

testimony from New York's Finest **validates** those claims of corruption. **During a** corruption trial Wednesday **former** New York City narcotics **detective** Stephen Anderson testified **that he and** other members






BET TALKS: FERG GETS REAL: FROM HARLEM'S STREETS ...    ✕

AD 1/1  - 00:14

keep up with **department** arrest quotas. Anderson

was
participating
in the trial
of Brooklyn
detective
Jason
Arbeeny
and was
called to
show that
the
practice of
planting
drugs,
known as
"flaking,"
was
commonplace
among the
narcotics
detectives.
Anderson,
who was

BET TALKS: FERG GETS REAL: FROM HARLEM'S STREETS ...    ✕

AD 1/1   - 00:14

"As a
detective,
you still
have a
number to
reach while

you are in
the
narcotics
division,"
he said
according
to the *New
York Daily
News.*
Advocacy
groups
called the
practice a
result of
the
country's
skewed
objectives
that stem
from the
war on
drugs.
"One of the

BET TALKS: FERG GETS REAL: FROM HARLEM'S STREETS ...     ✕

AD 1/1   - 00:14

some of
the less
honest
cops to
plant
evidence

on innocent people," said Gabriel Sayegh of the Drug Policy Alliance, an organization dedicated to promoting human rights based alternatives to the drug war. "The drug war inevitably

BET TALKS: FERG GETS REAL: FROM HARLEM'S STREETS ...    X

AD 1/1  · 00:14

that the NYPD has arrested more than 50,000 people last

# *Exhibit Q*

**Search by Officer Name or Badge Number**

# Joseph Franco



Badge #7972, Hispanic Male
Former Detective Grade 2 at Military and Extended Leave Desk
Also served at Narcotics Borough Manhattan South
Service started March 2000, ended June 2020, Tax #925313

**Substantiated Allegations:**
Abuse of Authority: Frisk (2)
Abuse of Authority: Search (of person)
Abuse of Authority: Vehicle search

**Lawsuit settlements:**
$175,000   Alston, David vs City of New York, et al., 2022 EDNY
$115,000   Joyner, Jermaine vs City of New York, et al., 2022 EDNY
 $50,000   Medina, Sterling Vs. City of New York, et al., 2022 BCSC
$175,000   Edwards, Alfred vs City of New York, et al., 2022 KCSC
 $25,000   Santaliz, Luis vs City of New York, et al., 2021 BCSC
$500,000   Pinheiro, Tristan vs City of New York, et al., 2021 KCSC
$350,000   Pinnock, Dalton vs City of New York, et al., 2021 KCSC
 $75,000   Soto, Jesus vs City of New York, et al., 2021 SDNY
$195,000   Bethea, Andre vs City of New York, et al., 2021 NYCSC
 $25,000   Baker, Tameeka vs City of New York, et al., 2020 SDNY
 $92,000   Figueroa, Erick vs City of New York, et al., 2019 NYCSC
 $13,100   Romain, Michael vs City of New York, et al., 2019 SDNY
 $90,000   Brooks, Lamont vs City of New York, et al., 2018 NYCSC
View Details

# Articles

Here are the most expensive NYPD lawsuits from this year, Gothamist, 9/2/2022
Bronx DA dropping 133 cases linked to indicted NYPD detective Joseph Franco, New York Post,

1/20/2022

22 NYPD Officers Were Convicted Of Dishonesty, Corruption, And Other Misconduct. Should Convictions They Helped Secure Stand?, Gothamist, 5/4/2021

NYPD detective arrested for perjury in April hit with two more charges of lying, New York Daily News, 7/9/2019

# Complaints

- 3  Complaints
- 12  Allegations
- 4  Substantiated

- 3  Substantiated (Command Discipline A)
- 1  Substantiated (Formalized Training)
- 1  Exonerated
- 7  Unsubstantiated

### Complaint #201700544, January 2017

| Allegation | Complainant | CCRB Conclusion |
|---|---|---|
| Force: Gun Pointed | Black Male, 31 | Exonerated |
| Abuse of Authority: Frisk | Black Male, 31 | Substantiated (Formalized Training) |
| Discourtesy: Word | Black Male, 31 | Unsubstantiated |

**Penalty: Formalized Training**

**Documents:**                                     Complaint Closing Report

additional details

### Complaint #201602949, April 2016

| Allegation | Complainant | CCRB Conclusion |
|---|---|---|
| Abuse of Authority: Gun Drawn | | Unsubstantiated |
| Force: Gun as club | Black Male, 30 | Unsubstantiated |
| Abuse of Authority: Threat of force (verbal or physical) | Black Male, 30 | Unsubstantiated |
| Force: Physical force | Black Male, 30 | Unsubstantiated |

**Documents:**                                     Complaint Closing Report

additional details

### Complaint #201606384, March 2016

| Allegation | Complainant | CCRB Conclusion |
|---|---|---|

| | | |
|---|---|---|
| Abuse of Authority: Vehicle stop | Black Male, 22 | Unsubstantiated |
| Abuse of Authority: Vehicle search | Black Male, 22 | Substantiated (Command Discipline A) |

**NYPD Conclusion:** Command Discipline - A

| | | |
|---|---|---|
| Force: Gun Pointed | Black Male, 22 | Unsubstantiated |
| Abuse of Authority: Frisk | Black Male, 22 | Substantiated (Command Discipline A) |

**NYPD Conclusion:** No Disciplinary Action-DUP

| | | |
|---|---|---|
| Abuse of Authority: Search (of person) | Black Male, 22 | Substantiated (Command Discipline A) |

**NYPD Conclusion:** Command Discipline - A

**Penalty: Command Discipline - A**

**Documents:**                                    Complaint Closing Report

additional details

**Conclusion Meanings:**
**'Exonerated':** or 'Within NYPD Guidelines' - the alleged conduct occurred but did not violate the NYPD's own rules, which often give officers significant discretion.
**'Substantiated':** The alleged conduct occurred and it violated the rules. The NYPD has discretion over what, if any, discipline is imposed.
**'Unsubstantiated':** or 'Unable to Determine' - CCRB has fully investigated but could not affirmatively conclude both that the conduct occurred and that it broke the rules.
Further details on conclusion definitions.

# Lawsuits

Named in 16 known lawsuits, $1,880,100 total settlements.

Munoz, Luis vs Nypd Police Detective Franco, Joseph, et al.
Case # 815595/2022E, Supreme Court - Bronx, November 17, 2022
Complaint
Description: On August 30, 2014, while the plaintiff was lawfully present on a street, he was subjected to an unlawful stop, questioning, frisk, search, false arrest, and false imprisonment by defendant NYPD officers. The plaintiff was falsely arrested by the defendant officers and wrongfully convicted of Criminal Possession and Sale of a Controlled Substance after NYPD Detective Joseph Franco and other defendant officers lied under oath about the facts of his case. Subsequently, the

plaintiff was unlawfully imprisoned at a precinct before being sentenced to approximately two and a half years of incarceration, which he served at several New York State Correctional Facilities. During his incarceration, the plaintiff was deni...

Alston, David vs City of New York, et al.
Case # 22CV05395, U.S. District Court - Eastern District NY, October 4, 2022, ended June 23, 2023
$175,000 Settlement
Complaint
Description: On May 15, 2005, David Alston was arrested by undercover officer John Volpe based on false claims by undercover officer Joseph Franco. Officer Franco claimed that Alston participated in an exchange of drugs for money with him on the street in Brooklyn. The alleged exchange was purportedly observed by undercover officer John Volpe and another unidentified undercover officer. Officer Volpe arrested Alston, and Alston was prosecuted and indicted based on the false claims. Alston subsequently accepted a plea deal. In 2019, Officer Franco was indicted on twenty-six criminal counts, including perjury and official misconduct after the Manhattan District Attorney's office initiated criminal charges against Franc...

Crespo, Edwin, et al. vs Franco, Joseph, et al.
Case # 22CV07345, U.S. District Court - Southern District NY, August 26, 2022
Complaint
Description: Between 2006 and 2015, each of the Plaintiffs, Edwin Crespo, Donte Smiley, Tony Serrano, Anthony Washington, Jose Santiago, and Sidney Wray were arrested in Bronx, New York by the Defendant Detective Joseph Franco while working for the NYPD. Defendant Detective Franco falsely charged each Plaintiff with crimes they did not commit , and otherwise conspired to frame them. Each of the criminal charges against each of the Plaintiffs was based upon false evidence that the Defendant Detective Franco fabricated, and the Defendant Detective Franco suppressed evidence of their misconduct from the prosecutor and the defense. Due to the Defendant Detective Franco's misconduct, each of the Plaintiffs faced years in pris...

Furet, Dwight vs City of New York, et al.
Case # 156987/2022, Supreme Court - New York, August 17, 2022

Joyner, Jermaine vs City of New York, et al.
Case # 22CV03946, U.S. District Court - Eastern District NY, July 12, 2022, ended November 14, 2023
$115,000 Settlement
Complaint
Description: Plaintiff Jermaine Joyner was accused by Defendant Detective Joseph Franco and Defendant Detective Christopher Muller to have been personally observed exchanging drugs with Detective Joseph Franco, for money, while he working as an undercover agent, on January 8, 2008, in front of 12 St. Mark's Place, Brooklyn, New York. A New York County grand jury indicted former

detective Franco in 2019 on twenty-six criminal counts, including perjury and official misconduct based on the discovery of video footage which confirmed that defendant Franco had testified falsely to witnessing drug transactions, which had led to several false arrests and prosecutions. Subsequently, in May of 2020, defendant Franco was fired from th...

Medina, Sterling Vs. City of New York, et al.
Case # 803514/2022, Supreme Court - Bronx, March 10, 2022, ended May 20, 2022
$50,000 Settlement
Complaint

Description: On August 15, 2013, Plaintiff was working at his cellphone store which he owned, when P.O.s including Officer Joseph Franco, entered the store. P.O.s asked Plaintiff for "flacko" to which Plaintiff did not respond. As Plaintiff walked outside and lit a cigarette, he was grabbed by multiple officers who placed him into handcuffs. P.O.s searched Plaintiff and took approximately $12,000 from him. P.O.s also searched the store and took another $8,000 in business proceeds from the store. P.O.s never returned the money to Plaintiff. Plaintiff was grabbed roughly and thrown into a vehicle without being told why he was being arrested. Plaintiff was take to the precinct and remained there for approximately twelve hours ...

Edwards, Alfred vs City of New York, et al.
Case # 501996/2022, Supreme Court - Kings, February 8, 2022, ended April 27, 2022
$175,000 Settlement
Complaint

Description: On April 9, 2011, defendant POs stopped, questioned, searched, and arrested Plaintiff when Plaintiff was cutting a client's hair at the barber shop located at 1307 Mermaid Avenue in Brooklyn. The defendants took the $116.00 in cash the Plaintiff had earned that day from his pocket, and restraining him with metal handcuffs during their pat-down search. The Plaintiff was placed in the back of an NYPD vehicle and transported to the 60th Precinct, and later was transported to County Central Bookings. On April 10, 2011, the plaintiff was arraigned in criminal court. The plaintiff knew he did not sell drugs, but still accepted a plea deal at his lawyer's persistent urging and was thereafter convicted and sentenced to...

Santaliz, Luis vs City of New York, et al.
Case # 817141/2021E, Supreme Court - Bronx, December 21, 2021, ended March 31, 2022
$25,000 Settlement
Complaint

Description: On August 25, 2015, Detective Franco and other defendant POs approached the plaintiff when he was inside the bodega at 423 East 138st Street. Detective Franco and other defendant POs took the plaintiff off the streets and grabbed him by the arm. Outside the bodega, defendants then searched and handcuffed the plaintiff and then transported the plaintiff to the 40th Police Precinct, where the plaintiff was searched and photographed. Around $600 cash was taken

from plaintiff's person. Plaintiff was interrogated without Miranda warnings or an attorney present by Detective Franco. Plaintiff was transported to Central Bookings and the went before a judge. The defendants provide false information for the prosecution t...

Pinheiro, Tristan vs City of New York, et al.
Case # 530106/2021, Supreme Court - Kings, November 30, 2021, ended June 30, 2022
$500,000 Settlement
Complaint

Description: On March 13, 2005, the plaintiff was outside his apartment building located at 125 Lenox Road, speaking to a friend. The plaintiff and his friend started to cross the street and were almost struck by an unmarked vehicle. Two defendant POs were rolled down the windows of the vehicle and told the plaintiff that he and his friend matched a description for a crime an that they need to search them. Plaintiff and his friend were then subject to pat-down search and arrested the plaintiff restraining him with metal handcuffs. Defendant POs then placed plaintiff in an NYPD van and transported to the 67th Precinct. The plaintiff was subject to strip search in the cell and was taken into an interrogation room for around 4...

Pinnock, Dalton vs City of New York, et al.
Case # 530116/2021, Supreme Court - Kings, November 30, 2021, ended April 11, 2022
$350,000 Settlement
Complaint

Description: On February 3, 2006, Plaintiff was walking toward the subway near 1702 Union Avenue in Brooklyn, when a plain clothed Police Officer unlawfully stopped, questioned, frisked, searched, and then handcuffed and arrested Plaintiff. When Plaintiff asked why he was being arrested, the Defendant Officer responded "You'll find out when you get to the precinct." Plaintiff was held in the NYPD police van for four hours and was denied being allowed to use a restroom, as Officers tightened his handcuffs. Plaintiff was convicted of Criminal Possession and Sale of a Controlled Substance after Detective Joseph Franco lied under oath and misrepresented the facts of his case. Plaintiff was then unlawfully imprisoned at the 71st...

Soto, Jesus vs City of New York, et al.
Case # 21CV05485, U.S. District Court - Southern District NY, July 1, 2021, ended November 2, 2022
$75,000 Settlement
Complaint

Description: On July 9, 2017, plaintiff was arrested by Det. Joseph Franco, Det. Sean Haggerty, and Det. Sean Brown, as well as one undercover officer. The officers false reported that plaintiff participated in a drug sale and that they witnessed plaintiff drop narcotics on the ground. Plaintiff was arraigned the next day on the charges and held in jail until his court date. Plaintiff eventually took a plea agreement. Det. Joseph Franco committed perjury on multiple occasions, which led ADA Cyrus Vance to move to vacate the convictions that Franco was involved in, including Soto's.

Bethea, Andre vs City of New York, et al.
Case # 155306/2021, Supreme Court - New York, June 16, 2021, ended April 19, 2022
$195,000 Settlement
Complaint
Description: On June 4, 2018, Plaintiff was walking toward Bleeker St. in Manhattan when two
Defendant Officers jumped out an an unmarked van and ordered Plaintiff to halt. Defendant Officers
grabbed Plaintiff's groin area in an effort to look for any illegal contraband and placed Plaintiff into
custody. Plaintiff was charged with criminal possession of a controlled substance and criminal sale of
a controlled substance by Officer Crevatas based on statements by Detective Franco that he
observed Plaintiff hand another individual crack/cocaine in exchange for money. Plaintiff remained
incarcerated for a total of 45 days before all criminal charges were dismissed on August 30, 2018.
The charges against Plaintiff were dismissed...

Baker, Tameeka vs City of New York, et al.
Case # 20CV00589, U.S. District Court - Southern District NY, February 4, 2020, ended January 26,
2021
$25,000 Settlement
Complaint
Description: On June 15, 2017, Plaintiff was falsely arrested for the sale of a controlled substance by
Officer Joseph Franco. After searching her based on the false arrest, the officer found controlled
substances on her person. Detective Franco gave false testimony that he personally witnessed
Plaintiff give drugs to a target. Video surveillance later proved his testimony to be false, and
Plaintiff's conviction was vacated after she spent over 1 year and 5 months in custody.

Figueroa, Erick vs City of New York, et al.
Case # 159168/2019E, Supreme Court - New York, September 30, 2019, ended January 6, 2020
$92,000 Settlement

Romain, Michael vs City of New York, et al.
Case # 19CV01516, U.S. District Court - Southern District NY, March 19, 2019, ended October 25,
2019
$13,100 Settlement
Complaint
Description: On June 26, 2018, plaintiff was engaged in conversation while standing on the street
when he was unlawfully searched by undercover NYPD officers. He was targeted because of his race.
Even though no contraband was found, plaintiff was arrested. Handcuffs were placed on him too
tightly. The officers falsely claimed that plaintiff had illegally sold marijuana in order to justify the
arrest. Criminal prosecution was initiated but all charges were dismissed on September 5, 2018.

Brooks, Lamont vs City of New York, et al.
Case # 160720/2018, Supreme Court - New York, November 20, 2018, ended December 14, 2021
$90,000 Settlement

## Other Documents

NYPD Trial Decision 4/21/2020
NYPD Trial Decision 7/13/2017

50-a.org — About — File a complaint

# *Exhibit R*

9/3/2021                    Brooklyn DA Will Purge 90 Convictions Involving An Indicted Detective, With 100 More Expected In Manhattan - Gothamist

NEWS [/NEWS]

# Brooklyn DA Will Purge 90 Convictions Involving An Indicted Detective, With 100 More Expected In Manhattan

BY GEORGE JOSEPH [/STAFF/GEORGE-JOSEPH]

APR 15, 9:01 AM ·

⬭ 14 COMMENTS [/NEWS/BROOKLYN-DA-WILL-PURGE-90-CONVICTIONS-INVOLVING-INDICTED-DETECTIVE-100-MORE-EXPECTED-MANHATTAN#COMMENTS]

   

P000095



➠ Manhattan District Attorney Cy Vance in February 2020   JASON SZENES/EPA-EFE/Shutterstock

Last week, Brooklyn District Attorney Eric Gonzalez announced
(https://gothamist.com/news/brooklyn-da-seeks-vacate-90-convictions-based-
work-nypd-detective-accused-perjury) he was moving to dismiss 90 convictions
involving Joseph Franco, an NYPD detective who was indicted
(https://www.manhattanda.org/d-a-vance-nypd-detective-charged-with-perjury-
official-misconduct-relating-to-unlawful-narcotics-arrests/) in 2019 for lying
under oath (https://gothamist.com/news/criminal-justice-advocates-demand-
investigation-after-nypd-detective-busted-for-repeated-false-arrests) about
three separate drug sales which he claimed to have witnessed. Now Manhattan
District Attorney Cyrus Vance has agreed to vacate and dismiss approximately 100
more convictions in which Franco played a key role, Gothamist/WNYC has learned.

P000096